SNOW STORM MINING CO. (NICHOLLS, Intervener) v. JOHNSON.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1911.)

No. 1,854.

FRAUDS, STATUTE OF (§ 84*)—CONTRACT FOR SALE OF MINING STOCK—PASSING OF TITLE.

Complainant was the owner of 1,500 shares of stock of defendant mining company, the certificate for which was destroyed by fire. Shortly afterward he made an agreement with intervener to sell him the stock for a stated price and gave a bond conditioned for its delivery within 70 days. It was further orally agreed that complainant should obtain a letter from the secretary of the company showing that he was the owner of the stock, and that a new certificate would be issued to him on compliance with the requirement of the by-laws in that regard, and that on delivery of such letter intervener should pay for the stock. Complainant procured and delivered such letter, when intervener required, as a further condition to payment, that complainant should execute to the company an indemnity bond required before issuance of a new certificate which complainant refused to do. *Held*, that, since certain things were required to be done by both seller and purchaser before payment for or delivery of the stock, the contract was clearly executory, and title to the stock did not pass; and that, as an essential part of the contract was in parol, it was void under Rev. Codes Idaho, § 6009, declaring such contracts invalid unless in writing or unless there was a delivery of some part of the property or payment of some part of the purchase price.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 154–161; Dec. Dig. § 84.*]

Appeal from the Circuit Court of the United States for the Northern Division of the District of Idaho.

Suit in equity by Andrew Johnson against the Snow Storm Mining Company; W. A. Nicholls, intervener. Decree for complainant, and defendant and intervener appeal. Affirmed.

The appellee filed in the court below a bill against the Snow Storm Mining Company, a corporation of the state of Idaho, in which he alleged, among other things, that he was the owner of 1,500 shares of the capital stock of the corporation, the certificate for which was theretofore, to wit, on the 28th day of November, 1904, destroyed by fire, at the city of Colfax, state of Washington; that he had complied with all the requirements of the corporation—which requirements the bill set forth—prescribed for the reissuance of lost or destroyed certificates, and, notwithstanding his demand upon the corporation for the reissue of a new certificate in place of the certificate so lost, the corporation refused to issue to him a new certificate, but had paid various dividends on his said stock to some person or persons other than the complainant, and had failed and refused to pay such dividends to him. He prayed that the corporation be required to account to him for such dividends and to issue to him a new certificate.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The mining company answered the bill, admitting the ownership of the complainant on the 28th day of November, 1904, of 1,500 shares of its stock, evidenced by its certificate No. 1,062, and that on that day such stock stood upon its books in the name of the complainant. It also admitted that prior to the commencement of the suit the complainant secured and filed with the secretary of the company an affidavit of the publication of the notice required by the by-laws of the company, accompanied by a copy of the notice so published, and the affidavit of the complainant, and it admitted its refusal to issue to the complainant a new certificate of stock. In other respects it interposed a denial of the averments of the bill.

The appellant Nicholls was, upon his petition, allowed to intervene in the cause, and thereafter filed an answer to the bill, and also a cross-bill in which he alleged that on or about the 19th day of December, 1905, the complainant entered into a contract with him, whereby the complainant agreed with the cross-complainant "to sell, and did sell," to the cross-complainant the 1,500 shares of the capital stock of the appellant company referred to in the bill, at the agreed price of 26½ cents a share, and further agreed with the cross-complainant that, in view of the lost and destroyed certificate for such shares, he (the complainant) "would do all things necessary to procure from the said Snow Storm Mining Company a new certificate of said stock, and would deliver the same to your orator, and especially that he would procure from the said Snow Storm Mining Company a statement that it would so issue the said certificate for the said 1,500 shares of stock, and that it was further agreed by and between the said parties to said agreement that the purchase price of the said 1,500 shares of stock, amounting in all to the sum of $397.50, should be paid by your orator to the said Andrew Johnson upon the procurement by the said Andrew Johnson of the said statement from the said Snow Storm Mining Company, or upon the delivery of said new certificate"; that thereafter the complainant failed and refused to procure such statement from the mining company and "refused to do those things necessary to procure said statement from the said Snow Storm Mining Company, or to procure the said certificate. to wit, he refused to execute the indemnity bond prescribed by the by-laws of the said corporation for the issuance of a new certificate in lieu of lost or destroyed certificates; and that your orator thereafter himself gave to the Snow Storm Mining Company the indemnity required by said company as security, and thereupon, and on the 26th day of February, 1906, the said Snow Storm Mining Company issued to your orator a new certificate, being No. 1,705, for the said 1,500 shares referred to in the bill of complaint herein, and thereupon, and forthwith, your orator waived the default of the said Andrew Johnson above set forth, and tendered to him the agreed price for said stock, to wit, the sum of $397.50, which the said Andrew Johnson refused to accept. And your orator thereafter, and upon the 1st day of March, 1906, again tendered the said amount to the said Andrew Johnson, who again refused to receive or accept the same."

The cross-bill then alleges that the cross-complainant is, and at all times has been, able and willing to comply with all the terms and conditions of the contract as alleged by him, and that the complainant refuses to accept the money tendered, or to perform any of the conditions of the contract; that the stock has no regular market price, but fluctuates daily, and cannot easily be estimated. The prayer of the cross-bill asks that the cross-complainant be adjudged the owner of the stock, and, in the event that relief be not awarded, that the complainant, Johnson, "be compelled to specifically convey said property to your orator upon the payment by your orator of the contract price therefor, at such time and in the manner that may be prescribed by the order of this court," and for general relief.

The complainant answered the cross-bill, putting in issue its averments.

The record shows that the facts of the case were practically stipulated to by the counsel of the respective parties, subject to objections to the competency of certain of the facts, and to certain of the oral testimony.

It showed the ownership by the appellee on the 28th day of November, 1904, of the 1,500 shares of stock of the appellant mining company, evidenced by its certificate of stock, and that the certificate was destroyed by fire as alleged in the bill. The by-laws of the company prescribed that any person

claiming to have lost a certificate might have a new certificate issued in its place upon producing evidence of having given notice of his loss for 60 days in a designated newspaper, and filing with the secretary of the company an affidavit setting forth the facts and circumstances of the loss, and executing a bond of indemnity in an amount to be fixed by the company.

The appellee testified that on the 19th day of December, 1905, at Colfax, Wash., he called the appellant Nicholls, who resided at Spokane, to the telephone, and told him that he (the appellee) had 1,500 shares of stock of the appellant company which he wanted to sell, but that, as the certificate for the shares had been burned, he was unable to deliver such certificate at once, and asked Nicholls if there was any way in which they could arrange for the sale so that the appellee could make the sale at once and deliver the stock afterwards, and that Nicholls replied that he thought there was, and suggested that the appellee give him a bond in the sum of $500 to insure delivery of the certificate within 70 days, or in such time as a new certificate could be obtained under the by-laws of the company; that Nicholls said he could use the stock if such an arrangement could be made, at the price of 26½ cents a share.

On the next day the appellee wrote to Nicholls as follows:

"Mr. Wm. A. Nicholls, Spokane, Wash.—Dear Sir: As per our talk over phone yesterday, I send you a bond in the sum of five hundred dollar to secure delivery of 1,500 shares of Snow Storm stock in seventy days I prefer that the bond be given to you in person rather than some stranger if you can arrange it that way I can deliver in that time but suppose a contingency such as delay in mail or neglect of the officers of the company to do their duty and I should be delayed a few days I know that you would not take advantage of that and stick me for $500.00 however I leave it to your own good judgment.

"Respt.                                        Andrew Johnson."

The letter contained the bond referred to, executed by the appellee and two sureties, conditioned as follows:

"The condition of this obligation is such that whereas, said Andrew Johnson claims to be the owner of fifteen hundred shares of the capital stock of the Snow Storm Mining Company of Mullan, Idaho, now, in consideration of the payment of the sum of three hundred ninety-seven & $^{50}/_{100}$ dollars to the said Andrew Johnson by the said ————, we, the undersigned, hereby agree to furnish to the said ————, within seventy days from date hereof, a certificate of stock for 1,500 shares of the capital stock of the said Snow Storm Mining Company; now, if the said Andrew Johnson shall well and truly furnish the said 1,500 shares of the capital stock of the said Snow Storm Mining Company to the said ———— within the time herein specified, then this obligation is to be void and of no effect; otherwise to remain and be in full force and virtue."

The appellee also testified in effect that, needing the money, and fearing there might be some trouble in effecting the sale, he went the next day to Spokane to see Nicholls. "I went in when I got to Spokane and called on Mr. Nicholls," said the witness, "and he had the bond there and seemed to be satisfied with it, and we talked matters over a little bit, and I gave him to understand that I was expecting my money. Mr. Nicholls then stated to me that he hadn't so understood it from the conversation we had over the telephone the day before, and he said that he was unable to get his client to come through; that his client, on that proposition, wouldn't pay him the money. Then I told Mr. Nicholls, 'If that is the case, we can't do any business, because the only purpose I have in selling this property is because I need the money at the present time, and that is all there is to it.' We went on and talked a little while along that line, and I asked him if he could suggest anything that I could do that would induce his client to take the matter up and give me my money, and he said he didn't know of anything. And finally I suggested this to him, 'Now, if your client has any doubts as to whether or not I am the owner of this property, I think I can satisfy him that I really am, and he is protected by this bond as to the delivery, and I can show him that I am able and can do it when I have complied with these

certain things, and I will get a statement from the secretary of the Snow Storm Company, over the seal and signature of the company, that the books show me to be the owner of this stock, and that they will issue the same to me in sixty days, and I will then be in a position to deliver the stock.' And he says: 'I will tell you what I will do. I will see my client and present the matter to him, and you come in later on.' So I went out and had an appointment with him along in the afternoon—I couldn't name the exact hour, but probably about 2 o'clock—and I came in again, and Mr. Nicholls told me he had seen his client, and his client was satisfied to do business on that basis; and so I says: 'All right; that settles it.' And so I left the bond with him there, and I went down home with the understanding that when I got home I was to write and get this statement from the Snow Storm Company; and I done so. I wrote to the company and asked them for this statement, and got it in due course of time, and forwarded it to Mr. Nicholls, and Mr. Nicholls, when he got the letter, instead of sending me my check, as I expected, came back with a counter proposition, which I refused to accede to."

The letter of the appellee to the mining company thus referred to in his testimony was written December 29, 1906 (1905), was addressed to the secretary of the Snow Storm Mining Company, and is as follows:

"I send you under separate cover copy of the 'Colfax Gazette' in which is a notice that explains itself: A similar notice running in your Mullan paper. These notices will continue for sixty days.

"You will greatly favor me if you will send me a statement over the seal and signature of the Snow Storm Co. to the effect that I am the owner of 1,500 shares of Snow Storm stock and that a certificate of same will be issued to me soon as these notices have run the agreed length of time—sixty days.

"I have sold this stock and have given a bond to the purchaser to deliver same in sixty days. Now he wants a statement from you that I own this stock and that you will issue this certificate soon as I have complied with the law in the case. Please let me hear from you soon as possible."

On the 2d of January, 1905 (1906), the secretary of the company replied to the appellee as follows:

"Mr. Andrew Johnson, Colfax, Wash.—Dear Sir: Replying to yours of Dec. 29th, will say that after examining our records we find that you are the holder of 1,500 shares of Snow Storm stock, and will, after notices have run 60 days, and upon receipt of your affidavit stating the facts and circumstances as near as possible, together with bond for 1 year of indemnity to the company of 25¢ per share ($375.00) properly executed, issue *issue* to you a new certificate for 1,500 shares."

Two days thereafter, to wit, January 4, 1906, the appellee wrote to the appellant Nicholls as follows:

"I inclose you letter from the secretary of the Snow Storm Co. that I think ought to satisfy your client the notices are now running in papers at Mullan and Colfax."

The appellant Nicholls refused payment for the stock upon receipt of such statement from the secretary of the mining company, insisting that one of the conditions of the contract was that the appellee should also furnish an indemnity bond to the mining company as a condition precedent to payment for the stock.

The record discloses this further correspondence in respect to the matter:

On the 24th of February, 1906, the appellant Nicholls wrote two letters upon the subject—one to the appellee, and the other to the secretary of the mining company. That to the appellee is as follows:

"Mr. Andrew Johnson, Colfax, Wash.—Dear Sir: The seventy days which you have under the terms of the bond given me to make delivery of 1,500 shares of Snow Storm at 26½ cents, will expire on the 27th of this month. The party to whom I sold the stock wishes to know if you will be able to make delivery on that date. Please advise me at once, as I am obliged to give him an answer.

　　"Respectfully,　　　　　　　　　　　　　　　W. A. Nicholls."

The letter of the same date to the secretary of the mining company is as follows:

"Mr. C. D. Miller, Secty. Snow Storm Mining Co., Mullan, Idaho—Dear Sir: I have a letter written to Andrew Johnson by yourself on January 2d informing (him) that the 1,500 shares of stock which was lost would be reissued providing a bond for $375.00 was properly executed after due notice had been given for 60 days in the newspapers. I have purchased this stock and Mr. Johnson has given me bond for delivery of same. Are you ready to reissue the shares upon the execution of the bond? I believe this notice has been published for at least 60 days.

"Respectfully,                                             W. A. Nicholls."

On the 26th of February, 1906, the president of the mining company wrote to the appellant Nicholls as follows:

"Replying to yours of the 24th inst. If you will write us a personal letter guaranteeing these 1,500 shares of stock it will not be necessary to furnish bond. We are inclosing you herewith certificate 1,705 for 1,500 shares. Trusting that this will be much easier for you, we remain,

"Yours truly,                                              W. D. Greenough."

To this letter the appellant Nicholls replied on the 1st day of March, 1906, as follows:

"Mr. W. D. Greenough, % Snow Storm Mining Co., Mullan, Idaho—Dear Sir: I beg to thank you for your favor of the 26th ulto., inclosing certificate No. 1,705 for 1,500 shares Snow Storm Mining Co. stock.

"I appreciate this accommodation, dispensing with all red tape, and I will agree to protect the Snow Storm Mining Co. in case anyone should turn up later, claiming to own these shares.

"By way of explanation I wish to add that I purchased this block of 1,500 shares from Andrew Johnson on December 19th, 1905, as I remember it. He executed an indemnifying bond in the sum of $500.00 to protect me against loss in case of failure to deliver the stock within 70 days from date. He wanted the money at that time and I agreed to pay him, providing he would get a note from the secretary of the company to the effect that the stock would be delivered to me within 70 days from date. Johnson then wrote to Mr. Miller and I have the latters' reply advising that he would issue the stock after notice had run for 60 days, providing the bond of indemnity were given to the company of $375.00, to remain in force for one year. I then wrote to Mr. Johnson, requesting that he execute this bond when I would be perfectly willing to pay him for the shares. He did not respond to my letter and I again wrote him on January 29th, making request that he arrange to deliver the stock promptly, but received no answer. Accordingly I made him a legal tender for the stock within the 70 days, at Colfax, supposing, of course, that he was prepared to make delivery, and was willing to do so, since he had never indicated a desire to repudiate. I received a letter from him last night, informing that he did not intend to make delivery of the stock, but that he would do anything which he considered reasonable to make me whole in the transaction.

"It is a plain case of a man's trying to welch on trade because the stock had advanced in price in the meantime. I have consulted my attorneys; Messrs. Happy & Hindman, in all the steps taken, and am advised that Johnson has no possible claim to this stock; that my bond is perfectly regular and that had he failed to deliver the stock, I could have collected $500.00 damages at once.

"I will hold this certificate of Snow Storm just issued, until this matter is entirely cleaned up to your satisfaction. When I wrote you advising that I had purchased the shares, it never occurred to me for a moment that Johnson would try to avoid the obligation.

"I will protect you in every respect, but there is no question as regards the validity of my claim, for I have proofs, and any statements from Mr. Johnson to the contrary are false.

"Respectfully,                                             W. A. Nicholls."

February 27, 1906, the appellant Nicholls tendered to the appellee. through the Colfax National Bank, $397.50, as payment for the stock in question. upon the tender of which the appellee wrote to the appellant Nicholls, as follows:

"Mr. W. A. Nicholls, Spokane, Wash.—Dear Sir: Mr. Coman of the Colfax Nat. Bank tendered me money to day for 1,500 shares of Snow Storm which I refused to axcept for this reason, your client has failed to meet any of the conditions provided in the bond which I gave to you you will remember when I was in Spokane. I agreed to get a statement from the secretary of the Snow Storm to the effect that the books showed me to be the owner of 1,500 shares upon this statement and the bond I gave you—you were to pay me 26½¢ for my stock. You refused to do this but submitted a counter proposition namely that I should give to the Snow Storm Co. a bond. This I have never agreed to do, and I have considered the trade off since your client's refusal to pay me my money after I had complied with all the conditions to which I agreed when in Spokane now the publication has run the required length of. time but owing to the fact this bond which I must give to the Co. is of an unusual nature it must be submitted to the home office of the bonding Co. which will require some time however I will soon be in position to deliver the stock and when I am I shall be glad to do business with you at what ever price the market may be at that time.

"You will understand the escence of the contract I made with you was the payment to me of the purchase price you having failed to do this makes the bond void and of none effect. I hope I have made my position clear in this matter and I desire to assure you that I will do anything in reason, to adjust this difficulty so that no one shall be the looser, that is in my power.

"Respt. Yours,                                        Andrew Johnson."

To the letter last above set out the appellant Nicholls replied as follows:

"Mar. 1, 1906.

"Mr. Andrew Johnson, Colfax, Wash.—Dear Sir: Your favor of the 27th ulto. at hand. I cannot agree with you in many of your statements. When you were in Spokane, I informed you that providing you could secure an agreement from the secretary of the company to issue me the 1,500 shares of Snow Storm after notice had run in the papers for 60 days. advising the public of the loss of the stock, that I would pay you the stipulated price of 26½ cents per share. You agreed to do this and later sent me a letter from the secretary in which he states that the stock would be issued in due time if you would file an indemnity bond at the rate of 25 cents per share, or $275.00. I· wrote, requesting you to attend to this, but received no reply. Then on January 29th, I again wrote. requesting that you make arrangements to deliver promptly,· further stating that I had closed the trade and had never received any advise from you calling it off. When you left here in It was agreed that if the trade did not stand, you were to write me to that effect at once and ask for the return of the bond. I have consulted my attorneys Messrs. Happy & Hindman in every step taken by myself. They have examined the bond carefully and state that it is valid absolutely, and can be enforced.

"It would have been unreasonable to ask me to put up 26½ cents per share. amounting to $397.50. and·further, to file a bond with the secretary at 25 cents per share, or $375.00 more. since your bond only protected me in the sum of $500.00, whereas I would be out $772.50, in case anyone else contested my right to the shares.

"I wrote to the secretary several days ago and .informed him that I had purchased the stock from you. and he promptly issued a certificate in my name and sent it to me. You acknowledged in your letter that the money was tendered to you by the Bank at Colfax, which you refused. I now inclose my check for $397.50, in full payment for the 1,500 shares which you sold me at 26½ cents.

"Respectfully,                        ·                    W. A. Nicholls."

The check for $397.50 inclosed in the letter last above set out was returned by the appellee to' the appellant Nicholls, in a letter of date March 2, 1906.

Happy & Hindman, for appellants.

Reese H. Voorhees, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Section 6009 of the Revised Codes of Idaho, in which state the suit was brought, declares various agreements invalid unless in writing, among them the following:

"An agreement for the sale of goods, chattels, or things in action, at a price not less than two hundred dollars, unless the buyer accept and receive part of such goods and chattels, or the evidences, or some of them, of such things in action, or pay at the time some part of the purchase money."

The statute of Washington upon the subject is substantially the same. Section 4577, Ballinger's Annotated Codes & Statutes.

Stock in corporations is embraced by such statutes. Franklin v. Matoa Gold Min. Co., 158 Fed. 941, 944, 86 C. C. A. 145, 16 L. R. A. (N. S.) 381, and cases there cited.

It is conceded by the appellants that the oral understanding had between the appellee and the appellant Nicholls over the telephone, falls within the statute; but they insist that the appellee's letter to Nicholls of date December 20, 1905, together with the bond contained therein, and his letter of date December 29, 1906 (1905), to the secretary of the Snow Storm Mining Company, constitute an executed sale, thereby passing title to the stock in question to the appellant Nicholls.

In the Elgee Cotton Cases, 22 Wall. 180, 187, 22 L. Ed. 863, the Supreme Court said:

"It must be admitted there is often great difficulty in determining whether a contract is itself a sale of personal property so as to pass the ownership to the vendee, or whether it is a sale on condition, to take effect or be consumated only when the condition shall be performed, or whether it is a mere agreement to sell. It is doubtless true that whether the property passes or not is dependent upon the intention of the parties to the contract, and that intention must be gathered from the language of the instrument. There are, however, certain rules for the construction of such contracts, which are well settled in England, and, we think, also in this country. Mr. Justice Blackburn, in his work on Sales, states two of them, and Mr. Benjamin, in his treatise, adds a third. They are as follows:

"First. 'When, by the agreement, the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property.'

"Second. 'Where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods, where the price is to depend on the quantity or quality of the goods, the performance of these things shall also be a condition precedent to the transfer of the property, although the individual goods be ascertained and they are in the state in which they ought to be accepted.'

"Third. 'Where the buyer is by the contract bound to do anything as a consideration, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer.'

"These may be regarded as rules for ascertaining the intention of the parties. They are in most cases held to be conclusive tests. Though not supported by all the decisions, they certainly are generally accepted in England, and by most of the courts in this country."

The second of the above-stated rules of interpretation is not applicable to the present case, but the first and third are. Tested by them, we think it very clear that the letters and bond relied upon by the appellants do not show an executed sale of the stock in question. It is true that in the letter of the appellee to the secretary of the company, he says, "I have sold this stock"; but that is by no means all that he says therein. He commences the letter by saying that he inclosed certain newspaper notices which were self-explanatory, and which manifestly were the published notices required by the by-laws of the corporation of the holders of its stock who had lost their stock certificates and desired a new issue in place of those lost or destroyed. The writer of the letter proceeds:

"You will greatly favor me if you will send me a statement over the seal and signature of the Snow Storm Co. to the effect that I (not the appellant Nicholls) am the owner of 1,500 shares of Snow Storm stock and that a certificate of same will be issued to me soon as these notices have run the agreed length of time—sixty days."

And it concludes with these words:

"I have sold this stock and have given a bond to the purchaser to deliver same in sixty days. Now he wants a statement from you that I own this stock and that you will issue this certificate soon as I have complied with the law in the case. Please let me hear from you soon as possible."

As a matter of course, to ascertain the true meaning of the letter, the whole of it must be considered. The case here is altogether unlike that of Beardsley v. Beardsley, 138 U. S. 262, 266, 11 Sup. Ct. 318, 34 L. Ed. 928, relied on by the appellants. There the words of the contract involved implied nothing executory, but something executed. Here the letter under consideration plainly implied that everything was executory and nothing executed. Neither in this letter nor in the one of the appellee to the appellant Nicholls of December 20, 1905, inclosing the indemnity bond to him, was there any mention of the payment of the consideration for the stock, either as to time of payment or amount thereof, nor was there any statement or intimation as to the time or place for the delivery of the stock. The letter containing the words, "I have sold this stock," so much relied upon by the appellants, expressly requested that the company issue to the appellee a new certificate in place of the one destroyed, and also a statement to the effect that he (the appellee) was then the owner of the 1,500 shares, which statement the letter further expressly declared the purchaser wanted. Why? If the sale had been consummated and the title to the stock had passed to the purchaser, why should the certificate be issued to the seller as owner? The reason, we think, is obvious enough from the letters relied upon by the appellants. It is still more obvious when the petition for intervention and the cross-complaint filed by the appellant Nicholls, as well as his testimony and other evidence in the cause, is considered. It is that the sale had not been consummated, no part of the purchase

price of the stock had been paid, nor had the time arrived under the contract between the parties for the delivery of the property agreed to be sold.

If anything more be needed to show that the contract relied on by the appellants was not a completed sale thereby passing title to the stock, it is shown by the letter of the appellant Nicholls to the appellee of March 1, 1906, in which, among other things, he says:

"When you left here in December it was agreed that if the trade did not stand you were to write me to that effect at once, and ask for the return of the bond."

Turning to the petition filed by the appellant Nicholls for leave to intervene in the cause, we find these allegations:

"That on or about December 19, 1905, the complainant in the said suit entered into a contract with your petitioner herein, whereby your complainant agreed with your petitioner to sell, and did sell, to your petitioner the 1,500 shares of the capital stock of the Snow Storm Mining Company referred to in the said bill of complaint, at the agreed price of 26½ cents per share; and further agreed with your petitioner that in view of the loss and destruction of the certificate for said 1,500 shares of stock, as set out in the said bill of complaint, he, the said complainant, would do all things necessary to procure from the said Snow Storm Mining Company a new certificate for said stock, and would deliver the same to your petitioner; and especially that he would procure from the said Snow Storm Mining Company a statement that it would so issue said new certificate for said 1,500 shares of stock. That it was further agreed by and between the parties to said agreement that the purchase price for the said 1,500 shares of stock, amounting in all to the sum of $397.50, should be paid by your petitioner to the complainant herein, upon the procurement by the said complainant of the said statement from the said Snow Storm Mining Company, or upon the delivery of the said new certificate.

"That thereafter the complainant herein refused and failed to procure such statement from the said Snow Storm Mining Company, and refused to do those things necessary to procure said statement from the said Snow Storm Mining Company, or to procure the said new certificate, to wit: He refused to execute the indemnity bond prescribed by the by-laws of the said corporation for the issuance of new certificates in lieu of lost or destroyed certificates, and that your petitioner thereafter himself gave to the Snow Storm Mining Company the indemnity required by the said company as security, and thereupon, on the 26th day of February, 1906, the said Snow Storm Mining Company issued to your petitioner a new certificate, being No. 1,705, for the said 1,500 shares of stock referred to in the bill of complaint herein, and thereupon and forthwith your petitioner, waiving the default of the complainant above set forth, tendered to the complainant herein the agreed price for the said stock, to wit, the sum of $397.50, which the said complainant refused to accept, and that your petitioner thereafter, and upon the 1st day of March, 1906, again tendered the said amount to the complainant herein, who again refused to receive or accept the same, and that your petitioner ever since has kept the said tender good, and has been able, ready, and willing to pay to the said complainant the said amount, and still is ready, able, and willing to pay said amount and perform any and all conditions of said contract as are and were by him to be kept and performed, and hereby tenders and offers to perform all the conditions of said contract."

The cross-bill contained similar allegations.

That an essential part of the contract between the appellee and the appellant Nicholls rested in parol is not only plainly shown by the pleadings of the latter above referred to, but also from the testimony given by him to the effect:

"That on the 19th day of December, 1905, the complainant herein, Andrew Johnson, had a conversation with the intervener, W. A. Nicholls, in the course of which he stated that he was the owner of 1,500 shares of the stock of the Snow Storm Mining Company, for which he had lost the certificate, and which he offered to sell to the said Nicholls at 26½ cents per share. The said Nicholls stated that he would take the stock at that price, as he had a client who would take it off his hands. The said Johnson at that time stated that he would take whatever steps were necessary to procure a certificate for the said 1,500 shares from the Snow Storm Mining Company; but that it would be about 70 days before he could procure a new certificate in lieu of the one he had lost. The said Johnson further stated that he would procure from the secretary of the Snow Storm Mining Company a statement that he was the owner of 1,500 shares of the company's stock, and that a certificate would be issued to him or his order at the end of 70 days. And the said Nicholls agreed to pay the purchase price for the stock upon the receipt of such statement from the secretary of the company; it being agreed that Johnson was to give a bond for the sum of $500 for the delivery of the certificate within 70 days. At that time the said Nicholls had no knowledge or information as to the conditions which would be required, or the terms which would be imposed by the Snow Storm Mining Company or its by-laws as a condition of the issuance of a new certificate of stock in lieu of the lost certificate. That this was the only transaction ever had between the complainant and the intervener, W. A. Nicholls. in reference to 1,500 shares of the capital stock of the Snow Storm Mining Company, and that all the letters covered by the stipulation filed in this case refer to that transaction alone."

It thus clearly appearing that an essential part of the contract in question rested in parol only, the contract was void by reason of the statute cited. Mentz v. Newwitter, 122 N. Y. 491, 25 N. E. 1044, 11 L. R. A. 97, 19 Am. St. Rep. 514; Gault v. Stormont, 51 Mich. 636, 17 N. W. 214; Bogigian v. Booklovers' Library, 193 Mass. 444, 79 N. E. 769; Porter v. Patterson, 42 Ind. App. 404, 85 N. E. 797; Turner v. Lorillard Co., 100 Ga. 645, 28 S. E. 383, 62 Am. St. Rep. 345; Catterlin v. Bush, 39 Or. 496, 65 Pac. 1065; Waterman v. Meigs, 4 Cush. (Mass.) 497; Bacon v. Eccles, 43 Wis. 227.

The judgment is affirmed.